ORAL ARGUMENT NOT YET SCHEDULED

No. 12-5383

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

SIERRA CLUB, et al.,

*Appellants*,

-v.-

KENNETH SALAZAR, IN HIS OFFICIAL CAPACITY AS SECRETARY
OF THE U.S. DEPARTMENT OF INTERIOR, et al.,

*Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA
Case No. 10-cv-1513 (RBW) (Hon. Reggie B. Walton)

**INITIAL BRIEF OF APPELLANTS**

Peter M. Morgan
Sierra Club Environmental Law Program
1650 38th St, Ste 102W
Boulder, CO 80301
(303) 449-5595 x102
(303) 449-6520 (fax)
peter.morgan@sierraclub.org

Aaron S. Isherwood
Sierra Club Environmental Law Program
85 Second Street, 2d Floor
San Francisco, CA 94105
(415) 977-5680
(415) 977-5793 (fax)
aaron.isherwood@sierraclub.org

Daniel P. Selmi
Attorney at Law
919 Albany St.,
Los Angeles, CA 90015
(213) 736-1098
(949) 675-9861 (fax)
dselmi@aol.com

Andrea C. Ferster
Attorney at Law
2121 Ward Court, N.W. 5th Fl.
Washington, D.C. 20037
(202) 974-5142
(202) 223-9257 (fax)
aferster@railstotrails.org

Elizabeth S. Merritt
Deputy General Counsel
National Trust for Historic Preservation
1785 Massachusetts Avenue NW
Washington, D.C. 20036
(202) 588-6026
(202) 588-6272 (fax)
emerritt@savingplaces.org

April 10, 2013                         *Counsel for Appellants.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**1. Parties and Amici**

In the District Court:

(A) Plaintiffs were the Sierra Club, the National Trust for Historic Preservation in the United States, the Ohio Valley Environmental Coalition, the Friends of Blair Mountain, Inc., the West Virginia Labor History Association, and the West Virginia Highlands Conservancy.

(B) Defendants were Ken Salazar in his official capacity as Secretary of the Interior, the U.S. Department of the Interior, Jon Jarvis in his official capacity as Director of the National Park Service, and Carol Shull in her official capacity as Interim Keeper of the National Register of Historic Places.

(C) Amici Curiae were the United Mine Workers of America and the West Virginia Coal Association, Inc.

Before this Court:

(A) Appellants are the Sierra Club, the National Trust for Historic Preservation in the United States, the Ohio Valley Environmental Coalition, the Friends of Blair Mountain, Inc., the West Virginia Labor History Association, and the West Virginia Highlands Conservancy.

(B) Appellees are Ken Salazar in his official capacity as Secretary of the Interior, the U.S. Department of the Interior, Jon Jarvis in his official capacity as Director of the National Park Service, and Carol Shull in her official capacity as Interim Keeper of the National Register of Historic Places.

(C) The United Mine Workers of America and the West Virginia Coal Association, Inc. have indicated their intent to participate as Amici Curiae before this Court.

Pursuant to Federal Rule of Appellate Procedure 26.1 and District of Columbia Circuit Rule 26.1, all of the Appellants state that they are not-for-profit organizations; none of them has any parent companies, subsidiaries or affiliates that issue shares to the public; and there are no publicly-owned companies that have an ownership share in any of these parties.

## 2. Rulings Under Review

The ruling under review is the October 2, 2012 memorandum opinion and related order of the U.S. District Court for the District of Columbia (Hon. Reggie B. Walton) granting defendants' motion for summary judgment. *See Sierra Club, et al. v. Ken Salazar, et al.*, Civil Action No: 10-1513 (RBW), [Docs. 42 and 43].

**3.  Related Cases**

This case has not previously been before this Court, and there are no

related cases.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ................................................................. C-1

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES .......................................................... iv

GLOSSARY ................................................................................ viii

STATEMENT OF JURISDICTION ............................................... 1

STATEMENT OF THE ISSUE....................................................... 1

STATEMENT OF FACTS ............................................................. 2

    A.    The Blair Mountain Battlefield is the site of the
largest domestic armed conflict since the Civil War. ............... 2

    B.    Members of the Coalition groups actively use,
study, and enjoy the Battlefield area. ........................................ 3

    C.    The Keeper of the National Register listed the
Battlefield in the National Register but then
removed it, based on erroneous assumptions
regarding procedural requirements. ........................................... 5

    D.    The Battlefield area contains coal resources
that mining companies are actively seeking
to develop. .................................................................................. 7

        1.    The Coal Company Objectors' expressed
intent to mine the Battlefield............................................ 7

        2.    The Adkins Fork Mine ...................................................... 9

        3.    The Bumbo No. 2 Mine ................................................... 11

        4.    The Camp Branch Mine ................................................... 12

        5.    The Piney Branch Mine ................................................... 13

    PROCEDURAL HISTORY OF THE LITIGATION ................................. 14

SUMMARY OF ARGUMENT ................................................................ 17

STANDARD OF REVIEW ................................................................... 23

ARGUMENT ........................................................................................ 24

I.   The Coalition and its members suffered injury in fact
     when the Battlefield was improperly removed from
     listing in the National Register because the legal
     protections from mining provided by that listing
     no longer apply. ............................................................................. 24

     A.   The Coalition's members have a concrete and
          particularized interest in the historic resources
          of the Battlefield. ..................................................................... 25

     B.   The threat of injury to the Coalition's interests is actual
          and imminent, because the de-listing of the Battlefield,
          combined with the permits issued to mine operators,
          establishes a substantial probability that historic
          Battlefield resources will be destroyed. ................................... 28

     C.   The District Court's focus on whether mining has
          actually started on the Battlefield conflicts with
          settled case law on standing and illogically assumes
          that applicants vigorously seeking permits do not
          intend to use them. ................................................................... 33

     D.   A federal agency decision supplies the requisite injury
          for standing if it weakens existing legal protections
          applied by state agencies. ........................................................ 36

     E.   The decisions relied on by the District Court involved
          more remote action and considerably more conjecture
          than are present in this case. .................................................... 41

II.  The destruction of historic resources on the Battlefield and the
     resulting injury to the Coalition is fairly traceable to the federal
     defendants' erroneous decision to remove the Battlefield from
     the National Register. ..................................................................... 48

A.    The decision to de-list the Battlefield removed important regulatory protections for the Battlefield area. ........................ 48

B.    The cause of the injury from weakening the protection for the Battlefield is neither speculative nor attenuated. ......... 52

III.  An order restoring the Battlefield to the National Register will redress the Coalition's injury because statutes and regulations that control surface mining protect historic resources on sites listed in the National Register. ........................................................... 54

CONCLUSION ........................................................................... 58

CERTIFICATE OF COMPLIANCE ............................................. 60

STATUTORY AND REGULATORY ADDENDUM .............................. A1

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Affum v. United States*,
    566 F.3d 1150 (D.C. Cir. 2009) ................................................................. 23

*Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*,
    650 F.3d 652 (7th Cir. 2011).......................................................... 20, 39, 40

*Babbitt v. United Farm Workers Natl. Union*,
    442 U.S. 289 (1979) ...................................................................... 20, 34, 40

*Begala v. PNC Bank, Ohio, Nat'l Ass'n*,
    214 F.3d 776 (6th Cir. 2000)...................................................................... 10

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...................................................................... 32, 48, 51

*Cantrell v. City of Long Beach*,
    241 F.3d 674 (9th Cir. 2001)...................................................................... 26

*Chamber of Commerce of U.S. v. E.P.A.*,
    642 F.3d 192 (D.C. Cir. 2011) ................................................................... 28

*Clapper v. Amnesty International USA*,
    133 S. Ct. 1138 (2013) .................................................................. 41, 45, 46

*Coleman v. Dretke*,
    409 F.3d 665 (5th Cir. 2005)...................................................................... 10

*DEK Energy Co. v. FERC*,
    248 F.3d 1192 (D.C. Cir. 2001) ................................................................. 28

*Del Monte Fresh Produce Co. v. United State*s,
    570 F.3d 316 (D.C. Cir. 2009) ................................................................... 34

*Dep't of Commerce v. U.S. House of Representatives*,
    525 U.S. 316 (1999) ................................................................................... 32

---

* Authorities upon which we chiefly rely are marked with asterisks.

*Equal Rights Ctr. v. Post Properties, Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) .............................................................. 23

*\*Friends of the Earth v. Laidlaw Envtl. Servs.,*
  528 U.S. 167 (2000) ........................................... 17, 24, 25, 26, 48, 52, 54

*Grassroots Recycling Network v. EPA,*
  429 F.3d 1109 (D.C. Cir. 2005) .......................................... 20, 41, 42, 43

*Karst Envtl. Educ. & Prot., Inc. v. EPA*,
  475 F.3d 1291 (D.C. Cir. 2007) .............................................................. 24

*Lemon v. Geren*,
  514 F.3d 1312 (D.C. Cir. 2008) .............................................................. 25

*Louisiana Envtl. Action Network v. Browner,*
  87 F.3d 1379 (D.C. Cir. 1996) ...................................................... 20, 41, 44

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .............................................................................. 24

*\*Nat'l Parks Conservation Ass'n v. Manson,*
  414 F.3d 1 (D.C. Cir. 2005) .................................. 19, 22, 23, 37, 48, 50, 54

*Pennsylvania v. West Virginia*,
  262 U.S. 553 (1923) .......................................................................... 20, 34

*Pub. Citizen v. U.S. Dist. Court for Dist. of Columbia*,
  486 F.3d 1342 (D.C. Cir. 2007) .............................................................. 24

*Pye v. United States*,
  269 F.3d 459 (4th Cir. 2001) .................................................................. 27

*\*S. Utah Wilderness Alliance v.*
  *Office of Surface Mining Reclamation and Enforcement,*
  620 F.3d 1227 (10th Cir. 2010) ........................................ 19, 25, 33, 34, 48

*Santa Monica Food Not Bombs v. City of Santa Monica*,
  450 F.3d 1022 (9th Cir. 2006) ................................................................ 10

*Settles v. U.S. Parole Comm'n*,
   429 F.3d 1098 (D.C. Cir. 2005) ................................................................ 23

*Sherley v. Sebelius*,
   610 F.3d 69 (D.C. Cir. 2010) ........................................................ 28, 30, 40

*Sherwood v. Washington Post*,
   871 F.2d 1144 (D.C. Cir. 1989) ................................................................ 24

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) .................................................................................. 25

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) .............................................................................. 52, 53

*United States v. Burch*,
   169 F.3d 666 (10th Cir. 1999) .................................................................... 9

*Utah v. Evans*,
   536 U.S. 452 (2002) ........................................................................ 23, 55, 57

*Yellow Taxi Co. of Minneapolis v. N.L.R.B.*,
   721 F.2d 366 (D.C. Cir. 1983) .................................................................... 9

## Federal Statutes

16 U.S.C. § 470 *et seq.* ................................................................................ 14

   § 470a(a)(6) ................................................................................................ 5

28 U.S.C. § 1291 ............................................................................................ 1

28 U.S.C. § 1331 ............................................................................................ 1

Surface Mining Control and Reclamation Act

   30 U.S.C. § 1201 *et seq.* ............................................................................ 8

   30 U.S.C. § 1201(c) .................................................................................. 21

   30 U.S.C. § 1202(g) .................................................................................. 21

   30 U.S.C. § 1253 ...................................................................................... 21

   30 U.S.C. § 1256(c) .................................................................................. 19

Surface Mining Control and Reclamation Act *(cont'd)*

*30 U.S.C. § 1272(e)(3)........................................ 21, 35, 38, 51

5 U.S.C. § 500 *et seq.* ............................................. 14

## **Federal Rules and Regulations**

23 C.F.R. § 774.17 ...................................................... 35

30 C.F.R. § 732.15(a) ................................................. 22

30 C.F.R. § 761.11(c) ....................................... 21, 35, 51

§ 761.17(d) ........................................... 21, 35, 51

36 C.F.R. § 60.2(d) ........................................ 8, 31, 49

§ 60.6 .......................................................... 5

Fed. R. App. P. 4(a)(1)(B) .......................................... 1

Fed. R. Civ. Proc. 56(e) ............................................ 32

Fed. R. Evid. 201 ...................................................... 9

201(b) ..................................................... 10

## **Federal Register**

77 Fed. Reg. 42,802 ................................................. 35

77 Fed. Reg. 42,804 ................................................. 35

## **West Virginia Statutes and Rules**

W. Va. Code § 22-3-22(b) ............................................ 5

W. Va. Code § 22-3-8(a)(3)..................................... 19, 40

*W. Va. Code R. § 38-2-3.17.c .................... 21, 35, 36, 38, 51, 52, 56, 57

W. Va. Code R. § 38-2-3.19 .............................. 35, 38, 49

# GLOSSARY

| | |
|---|---|
| Battlefield | The 1,600-acre portion of Blair Mountain and the surrounding area in Logan County, West Virginia that was the site of the 1921 Battle of Blair Mountain, which was listed in the National Register of Historic Places on March 30, 2009 |
| Coal Company Objectors | Coal mining companies and coal owners, including Arch Coal and Alpha Natural Resources and their subsidiaries, who objected to listing of the Battlefield on the National Register of Historic Places |
| Coalition | Joint reference to all Appellants in this case |
| Keeper | Keeper of the National Register of Historic Places, an official of the National Park Service |
| National Register | National Register of Historic Places |
| SMCRA | Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 *et seq.* |

## STATEMENT OF JURISDICTION

This appeal arises from a final judgment of the District Court disposing of all the parties' claims. The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291, as the appeal arises from a final decision of the District Court. That court issued its Order granting defendants' motion for summary judgment and denying the plaintiffs' motion for summary judgment on October 2, 2012. Plaintiffs filed their notice of appeal of the District Court's order on November 29, 2012, within the time allowed by Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUE

Whether the members of the Coalition have standing to challenge the decision of federal officials to remove the Blair Mountain Battlefield from the National Register of Historic Places, where (1) that decision greatly reduces the legal protection of the Battlefield from coal mining, and (2) mining companies currently possess permits to mine coal within the Battlefield.

## STATEMENT OF FACTS

### A.    The Blair Mountain Battlefield is the site of the largest domestic armed conflict since the Civil War.

Blair Mountain and the surrounding area in Logan County, West Virginia (hereafter "the Battlefield"), is the site of the 1921 Battle of Blair Mountain, the largest and most violent armed conflict fought on American soil since the Civil War. [Doc. 14 (Def. Am. Answer), ¶ 28]. The Battlefield site consists of approximately 1,600 acres stretching ten miles across the summit of Spruce Ridge Fork, including Blair Mountain. [Doc. 14, ¶ 33]. It is considered one of the most important sites in American labor history. [Doc. 14, ¶ 28].

The Battle of Blair Mountain culminated a three-year-long struggle to unionize the coal miners of four counties in West Virginia. [Doc. 14, ¶ 28]. The Battle was ignited by the murder of Sid Hatfield, Police Chief of Matewan, West Virginia. [Doc. 14, ¶ 29]. Hatfield had protected coal miners that were evicted from a camp by company-controlled armed guards in retaliation for the miners' joining the union in August 1920. [Doc. 14, ¶ 29]. On August 30, 1921, a force of between 5,000 and 13,000 miners began a march to Mingo County, which was under martial law. [Doc. 14, ¶ 29]. The miners sought the right to unionize and to exercise their civil liberties – freedom of speech and assembly, freedom from the industrial feudalism of

the company towns, and freedom from the terrorism inflicted by coal mining operators and their hired gunmen. [Doc. 14, ¶ 29].

The miners' march was met by a force of 3,000 armed men, many of whom were on the coal companies' payrolls. [Doc. 14, ¶ 30]. These men established a defense line along Spruce Fork Ridge on Blair Mountain that stretched for ten miles, with two armed pickets stationed every fifty yards. [Doc. 14, ¶ 30]. The coal company forces dug trenches, blocked roads, felled trees, dropped home-made bombs, and fired an estimated one million rounds of ammunition at the miners from mounted machine guns along the 15-mile ridgeline. [Doc. 14, ¶ 30]. The Battle resulted in numerous casualties. [Doc. 14, ¶ 30]. The miners surrendered on September 5, 1921, after federal troops arrived. [Doc. 14, ¶ 30].

**B.    Members of the Coalition groups actively use, study, and enjoy the Battlefield area.**

Members of groups that comprise the Coalition use, enjoy, and study the Blair Mountain Battlefield area and its historic resources. These members have often visited the Battlefield and led tours of historic locations and artifacts. *See, e.g.*, [Doc. 23-3 (Hendrix Decl.), ¶ 12; Doc. 23-4 (Ayers Decl.), ¶¶ 7-9; Doc. 23-5 (Martin Decl.), ¶ 9; Doc. 23-6 (Rasmussen Decl.), ¶¶ 1, 6; Doc. 23-7 (Simmons Decl.), ¶ 5]. They rely professionally on the site as the subject of archaeological and historical research about the Battle

3

of Blair Mountain. *See, e.g.*, [Doc. 23-4 (Ayers Decl.), ¶¶ 7-9; Doc. 23-6 (Rasmussen Decl.), ¶¶ 1-2].

Some Coalition group members also value the site because their family members fought in the Battle, and the Battlefield represents an important part of their family history and cultural heritage. [Doc. 23-5 (Martin Decl.), ¶ 8]. Coalition group members are concerned that the history of the Battle will be lost to posterity if coal mining is allowed to destroy vulnerable artifacts and other historic resources within the Battlefield area itself. [Doc 23-3 (Hendrix Decl.), ¶¶ 7-8; Doc. 23-5 (Martin Decl.), ¶ 8]. In that event, these members will lose the opportunity to share those resources – and the important stories they tell – with future generations. *See*, *e.g.*, [Doc. 23-5 (Martin Decl.), ¶¶ 10-12; Doc. 23-7 (Simmons Decl.), ¶¶ 6-7; Doc. 23-8 (Ziehl Decl.), ¶ 7].

Since at least 1980, the Coalition groups as well as other individuals and organizations have sought to protect the Battlefield's historic resources and the features that define its historic character. [Doc. 14, ¶ 31; Doc. 30-1 (Hendrix Decl.), ¶ 5]. These resources include the topography of Spruce Fork Ridge and the numerous artifacts from the Battle that remain on the site, such as buttons, firearms, ordnance, and shell casings. [Doc. 14, ¶ 33; Doc. 23-8, ¶ 5]. The Coalition's efforts to protect the Battlefield have included

4

nominating the 1,600-acre site for listing in the National Register of Historic

Places ([Doc. 14, ¶¶ 31-32]), and petitioning to designate the site as

"unsuitable" for coal mining under West Virginia's surface mining program,

W. Va. Code § 22-3-22(b) ([Doc. 30-1 (Hendrix Decl.), ¶ 5; Doc. 30-2

(petition and supporting exhibits)]).

### C.     The Keeper of the National Register listed the Battlefield in the National Register but then removed it, based on erroneous assumptions regarding procedural requirements.

On January 13, 2009, the West Virginia State Historic Preservation

Officer nominated the Battlefield to the Keeper of the National Register

("Keeper") for listing in the National Register of Historic Places. [Doc. 14, ¶

47; A.R. 180-81]. The January 2009 nomination stated that a majority of

landowners had not filed objections to the nomination.[1] [A.R. 180-81].

Relying on the nomination, the Keeper listed the Blair Mountain Battlefield

in the National Register on March 30, 2009. [Doc. 14, ¶ 59; A.R. 224, 338].

Both during the nomination process and after the Battlefield's listing

in the National Register, coal mining companies and coal owners within the

Battlefield nomination area repeatedly objected to the listing. [Doc. 14, ¶¶

---

[1]  "If the owner or owners of any privately owned property, or a majority of the owners of such properties within the district in the case of a historic district, object to such inclusion or designation, such property shall not be included on the National Register . . . until such objection is withdrawn."  16 U.S.C. § 470a(a)(6). *See also* 36 C.F.R. § 60.6.

5

42, 52, 54; A.R. 877-78 (March 7, 2008 objection), 244-50 (February 27,

2009 objection), 299 (March 27, 2009 objections), 313 (March 30, 2009

objection), 466-67 (May 22, 2009 objections)]. Represented by the law firm

Jackson Kelly, the objecting companies included Natural Resource Partners,

LP, Arch Coal, Inc., and Massey Energy Corporation (hereafter, "Coal

Company Objectors" or "Objectors"). The Coal Company Objectors claimed

that a majority of land owners within the nomination area objected to listing

the Battlefield. *Id.*

On July 9, 2009, just over three months after formally listing the

Battlefield in the National Register, the Keeper published a notice of intent

to remove the Battlefield from that listing. [A.R. 499, 504]. The Keeper cited

"procedural error in the counting of property owners who objected to the

National Register listing." [A.R. 499, 504]. On December 30, 2009, nine

months after the original listing, the Keeper removed the Battlefield from the

National Register. [Doc. 14, ¶ 64; A.R. 691]. The Keeper found a

"miscalculation" in the percentage of owners of private property objecting to

the National Register nomination. [A.R. 691]. According to the Keeper,

"The corrected count yielded more than 50% objecting, which precludes

listing in the National Register." [A.R. 691].

In response, the Coalition groups petitioned the Keeper to reconsider the decision removing the Battlefield from the National Register. [A.R. 760-70]. The petition for reconsideration cited legal and factual errors in that removal decision. [A.R. 760-70]. Among other errors, the Keeper relied on selective and unverified changes in ownership alleged by the coal company lawyers and also counted a number of objections that did not conform to the Keeper's own regulations and guidance. The Keeper denied the petition for reconsideration on July 29, 2010. [A.R. 778-79].

**D.    The Battlefield area contains coal resources that mining companies are actively seeking to develop.**

The Coal Company Objectors hold permits allowing them to strip mine coal within the Battlefield nomination area. The Coal Company Objectors have renewed these permits to preserve their ability to mine, and they have repeatedly expressed their intent to mine the area. Further, mining companies have continued to seek new permits and renewals of existing mining permits after March 30, 2009 – the date that the Battlefield was listed in the National Register.

**1.    The Coal Company Objectors' expressed intent to mine the Battlefield**

In a letter dated February 27, 2009, the Coal Company Objectors wrote to West Virginia's State Historic Preservation Officer objecting to the

7

Battlefield's nomination. [A.R. 244]. The letter described the Objectors as "owners of mineral and surface real property in the nomination area." [A.R. 244]. In the letter, the Objectors represented that they have "an acute interest in the nomination" because they "own[] or lease[] minerals, particularly coal, with the expectation of developing them in the nomination area." [A.R. 246]. The Objectors also alleged that they "[c]ollectively . . . own the vast majority of the surface and minerals in the nomination area." [A.R. 246].

The Coal Company Objectors asserted that listing the Battlefield in the National Register would adversely affect their ability to mine coal within the nomination area. As they explained, "The Keeper's own regulations recognize the legal significance that listing has on coal resources," citing 36 C.F.R. § 60.2(d). [A.R. 246].

The Coal Company Objectors hold numerous coal mining permits issued by the West Virginia Department of Environmental Protection. The Department is the state agency responsible for issuing mining permits under the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 *et seq.* ("SMCRA"). These permits confirm the Objectors' professed intentions to mine the Battlefield.

The permits, and the adverse impacts that the authorized mining will have on the Battlefield, are described in a report issued by Coalition member

8

Friends of Blair Mountain on September 8, 2010. [Doc. 30-2 at 162]. The

report explained how several permits "most endanger" the Battlefield site.

[Doc. 30-2 at 165]. Those permits include S500503 (Adkins Fork), S504991

(Bumbo No. 2), and S501390 (Camp Branch). [Doc. 30-2 at 165].

## 2.     The Adkins Fork Mine

Mingo Logan Coal Company, a subsidiary of Objector Arch Coal

([A.R. 244, 1499]), holds a surface mining permit for the Adkins Fork mine

(S500503). [A.R. 1471]. Issued on September 25, 2007, the permit covers

332.9 acres within the historic boundaries of the Blair Mountain Battlefield

and was initially scheduled to expire on September 25, 2012. [A.R. 1471].

Mingo Logan's application for renewal of this permit was granted in

February 2013.[2]

---

[2] West Virginia Department of Environmental Protection (WV DEP)'s
online permit database entry for permit S500503, available at:
https://apps.dep.wv.gov/WebApp/_dep/search/Permits/OMR/Permit_details.
cfm?permit_id=S500503&dep_office_id=OMR&responsible_party_name=
MINGO%20LOGAN%20COAL%20COMPANY (last visited April 9,
2013). The Court may take judicial notice of the state agency's online permit
database. Courts of appeal can take judicial notice under Federal Rule of
Evidence 201, which allows judicial notice "at any stage of the proceeding."
*See also Yellow Taxi Co. of Minneapolis v. N.L.R.B.*, 721 F.2d 366, 375 n.29
(D.C. Cir. 1983) ("[t]he propriety of taking [judicial] notice on appeal is well
established"); *United States v. Burch*, 169 F.3d 666, 671 (10th Cir. 1999)
("judicial notice may be taken at any time, including on appeal"). Rule
201(b) states that "[a] judicially noticed fact must be one not subject to
reasonable dispute in that it is either (1) generally known within the
territorial jurisdiction of the trial court or (2) capable of accurate and ready

The 2007 surface mining permit for the Adkins Fork Mine acknowledged that the mining could impact "historic or archaeological properties listed on or eligible for listing on the National Register of Historic Places." [A.R. 1471]. Archaeological reports prepared for the mine found that historic artifacts relating to the Battle of Blair Mountain are present within the permit boundary. [A.R. 1472-81]. Consistent with this conclusion, the report by the Friends of Blair Mountain describes the Adkins Fork permit area as "located on the southern edge of the battlefield" and affecting "12 major sites in the battlefield." [Doc. 30-2 at 182]. A map included in the report shows the area of overlap between the permit and the nomination area. [Doc. 30-2 at 184]. Despite these potential impacts on the Battlefield, the permit only required the mine operator to use "appropriate mitigation and

---

determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Information and documents provided on a state agency's website satisfy this second prong. *See Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000) ("Public records and government documents are generally considered 'not to be subject to reasonable dispute' [and therefore constitute judicially noticeable facts]. This category includes public records and government documents available from reliable sources on the Internet.") (internal citation omitted)*; Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) ("we fail to see any merit to an objection to the panel taking judicial notice of the state agency's own website."); *Santa Monica Food Not Bombs v. City of Santa Monica,* 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (taking judicial notice of "public records" that "can be accessed at Santa Monica's official website").

treatment measures" – which were never defined – to protect those resources.

[A.R. 1471].

### 3.     The Bumbo No. 2 Mine

Mingo Logan Coal Company also holds a permit for the Bumbo No. 2

mine (S504991), which overlaps the Battlefield. [Doc. 30-2 at 194]. This

permit covers approximately 1,500 acres, including a long stretch of Spruce

Fork Ridge within the central part of the Battlefield nomination area. [Doc.

30-2 at 194; *id.* at 196 (map of the Bumbo No. 2 mine showing its overlap

with the nomination area)]. A 2008 cultural resources survey prepared for

Arch Coal ([A.R. 1341-45]) acknowledged that "[t]he proposed Blair

Mountain Battlefield National Register NR District overlaps with the

western portion of the Bumbo Mine" ([A.R. 1344]). The report also found

that "[a]pproximately 590 acres of the proposed Blair Mountain District is

contained within the boundaries of the 1,511.49-acre Bumbo Mine." [A.R.

1345].

The Friends of Blair Mountain report indicates that the permit for

Bumbo No. 2 originally issued in 1995 and was scheduled to expire in

February 2010. [Doc. 30-2 at 194]. At the time of the report, the permit's

status was listed as "active, no coal removed." [Doc. 30-2 at 194]. However,

Mingo Logan applied for renewal of the permit, and that renewal was

11

granted in April 2010.[3] The permit will now remain in force until February

2015.[4]

### 4.    The Camp Branch Mine

Aracoma Mining, a subsidiary of one of the Coal Company

Objectors,[5] holds the Camp Branch mine permit (S501390).[6] This permit

overlaps a southern section of the Battlefield nomination area between the

Bumbo No. 2 mine to the north and the Adkins Fork mine to the south. [Doc.

30-2 at 191-92]. The Camp Branch permit first issued in 1991 and was

slated to expire in July 2011. [Doc. 30-2 at 191]. However, the permit was

renewed in 2012 and now will not expire until July 2016.[7] As of September

2010, just prior to filing of the complaint in the present action, mining was

---

[3] WV DEP permit database website entry for permit S504991, available at:
https://apps.dep.wv.gov/WebApp/_dep/search/Permits/OMR/Permit_details.
cfm?permit_id=S504991&dep_office_id=OMR&responsible_party_name=
MINGO%20LOGAN%20COAL%20COMPANY (last visited April 9,
2013).
[4] *Id.*
[5] Aracoma was a subsidiary of Objector Massey Energy at the time that the
Blair Mountain Battlefield was listed in the National Register. *See* [A.R.
244]. Massey Energy was subsequently purchased by Alpha Natural
Resources, and Aracoma is now a subsidiary of Alpha Natural Resources.
[6] WV DEP permit database website entry for permit S501390, available at:
https://apps.dep.wv.gov/WebApp/_dep/search/Permits/OMR/Permit_details.
cfm?permit_id=S501390&dep_office_id=OMR&responsible_party_name=
ARACOMA%20COAL%20COMPANY%20INC (last visited April 9,
2013).
[7] *Id.*

proceeding from the western edge of the permit area toward the Battlefield

nomination area to the east. [Doc. 30-2 at 191].

###     5.     The Piney Branch Mine

Aracoma is also seeking another permit (S503508) for a mine that

would be situated adjacent to the Battlefield and would potentially impact

historic resources within the nomination area. The Piney Branch mine would

be located to the southwest of the Bumbo No. 2 mine and north of the Camp

Branch mine. Aracoma submitted its original permit application in

November 2008, and most recently re-submitted the permit application in

November 2012.[8] Aracoma applied for a Clean Water Act section 404

permit for the mine in August 2011, but that permit has not yet been issued.[9]

---

[8] WV DEP permit application database, application milestones website entry
for permit S503508, available at:
https://apps.dep.wv.gov/WebApp/_dep/search/Applications/activities.cfm?a
pplication_id=50346&dep_office_id=OMR&ap_type_code=SMA&DESCR
IPTION=Surface%20Mine%20Application&responsible_party_name=ARA
COMA%20COAL%20COMPANY%20INC&APPLICATION_SEQUENC
E_ID=1&APPLICATION_PERMIT_ID=S503508 (last visited April 9,
2013).
[9] U.S. Army Corps of Engineers, Huntington District, public notice of permit
application, available at:
http://www.lrh.usace.army.mil/Missions/Regulatory/PublicNotices/tabid/412
5/Article/8355/lrh-2008-1104-guy.aspx (last visited April 9, 2013).

## PROCEDURAL HISTORY OF THE LITIGATION

Concerned about impending destruction of the Battlefield's historic resources due to the Keeper's unlawful removal of the site from the National Register, the Coalition filed a complaint in the U.S. District Court for the District of Columbia on September 9, 2010. [Doc. 1]. The Coalition filed an amended complaint on December 21, 2010, asking the court (1) to declare that, in removing the Blair Mountain Battlefield from the National Register of Historic Places on December 30, 2009, the Keeper violated the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*; and (2) to vacate the decision removing the Battlefield *nunc pro tunc* as of March 30, 2009. [Doc. 11].

On April 11, 2011, the Coalition moved for summary judgment on all of its claims. [Doc. 23]. On May 23, 2011, the defendants filed both an opposition to the Coalition's motion for summary judgment and its own cross-motion for summary judgment, arguing among other points that the Coalition lacked standing. [Doc. 28].

The West Virginia Coal Association sought and received permission to file an amicus curiae brief in support of the defendants. [Doc. 35]. The Coal Association stated that it had an interest in the case because:

> The owners and lessors of coal interests who control the
> majority of land within the proposed boundary of Blair

14

> Mountain nomination area (the property at issue in this case)
> are members of WVCA. The Keeper of the National Register of
> Historic Places' ('Keeper') decision, or any decision by this
> Court reviewing the de-listing decision of the Keeper, *will
> directly affect the WVCA and its members in this case*, and in
> future National Historic Preservation Act ('NHPA') cases
> involving land in West Virginia that has pre-existing or future
> surface or underground coal mining permits.

[*Id.* at 2 (emphasis added)].

On October 2, 2012, the District Court issued a final memorandum

opinion and order holding that the Coalition members lacked Article III

standing to maintain the action.[10] [Docs. 42 and 43]. The District Court first

concluded that the case could not be characterized as one involving

"procedural injury," and therefore, the Coalition could not avail itself of the

lowered threshold for satisfying the causation and redressability prongs of

the standing inquiry.[11] [Doc. 42 at 13-15]. The District Court then addressed

---

[10] The District Court had issued an order on September 28, 2012, deciding
the cross-motions for summary judgment. The order granted the defendants'
summary judgment motion and denied the Coalition's summary judgment
motion, while indicating that the order was "not a final Order subject to
appeal." [Doc. 41].

[11] The Coalition disagrees with this conclusion. However, the Coalition
members meet the traditional test for standing and therefore need not rely on
the test for "procedural standing." As demonstrated in this brief, Coalition
members have suffered injury in fact caused by the Keeper's action in
removing Blair Mountain from the National Register on December 30, 2009,
and that injury is redressable by an order vacating the Keeper's December
30, 2009 decision.

15

the injury, causation, and redressability prongs of standing, concluding that the Coalition satisfied none of these prongs. [Doc. 42 at 21-25].

The District Court reasoned that the Coalition did not prove exactly when the companies actually intended to begin mining within the Battlefield, and therefore could not prove that destruction of historic resources was "imminent." [Doc. 42 at 21-22]. In reaching this conclusion, the District Court relied on the Friends of Blair Mountain report describing permits that overlap the Battlefield ([Doc. 30-2]). However, the Court did not credit the descriptions of the unexpired permits for the Adkins Fork, Bumbo No.2, and Camp Branch mines. [Doc. 42 at 17-19]. Instead, the Court selectively discussed older permits that had expired, permits in reclamation, and permits for support infrastructure such as haul roads or slurry ponds. [Doc. 42 at 18-19].

The Court also concluded that the injury was not redressable because permits already issued to the Coal Company Objectors would be considered "valid existing rights" and therefore not subject to the heightened protections available to National Register-listed sites under SMCRA. [Doc. 42, at 24-25]. However, the District Court failed to identify any facts in the record showing that valid existing rights have been established. [Doc. 42, at 24-25]. The District Court also failed to consider the heightened regulatory protections

16

that apply to all permits, including those with established valid existing rights. [Doc. 42, at 24-25].

Because the District Court concluded that the Coalition lacked standing, it further decided that "this Court is not permitted under Article III of the Constitution to exercise jurisdiction over the [Coalition's] claims." [Doc. 42 at 25]. The District Court issued an appealable final order contemporaneously with its memorandum opinion. [Doc. 43]. The Coalition timely filed a notice of appeal with the District Court on November 29, 2012. [Doc. 44].

## SUMMARY OF ARGUMENT

By deciding to remove the Blair Mountain Battlefield from listing in the National Register of Historic Places, the federal defendants opened the way for coal strip mining to destroy portions of the Battlefield. Despite this threat, the District Court found that the Coalition lacked standing to challenge the defendants' action. This holding was incorrect.

Standing requires the plaintiff to prove that: (1) it has suffered injury in fact that is concrete and particularized as well as actual or imminent; (2) the injury is fairly traceable to defendants' actions; and (3) a favorable decision is likely to redress the injury. *See, e.g., Friends of the Earth v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 180-81 (2000).

17

The District Court did not dispute the interest of the Coalition's members in the Battlefield's use. Unopposed affidavits show that they use the Battlefield for professional research through the study of the site and its artifacts and earthworks. The affidavits also show that they have a deep and abiding interest in protecting the Battlefield so that they and others may continue to understand and appreciate the pivotal historical events that took place on Blair Mountain.

Instead, the District Court's holding that the Coalition members lacked standing rested on the Court's finding that mining within the Battlefield was not "imminent." The Court reasoned that, notwithstanding the issuance of multiple permits to mine within the Battlefield, injury was not imminent because mining activities pursuant to the permits had not yet commenced. [*See* Doc. 42, at 21-22].

Two sets of facts fundamentally contradict the District Court's reasoning regarding the imminence of mining. First, mining companies already possess three permits authorizing coal mining within the Battlefield, and all three have been renewed after the defendants' unlawful removal of Blair Mountain from the National Register. The mining companies are also actively pursuing a fourth permit. Further, because SMCRA requires a permittee to commence mining operations within three years of permit

18

issuance or risk losing the permit, the mining companies have a powerful incentive to begin mining sooner rather than later. *See* W. Va. Code § 22-3-8(a)(3); 30 U.S.C. § 1256(c).

Second, the mining companies vigorously opposed the National Register listing of the Battlefield, citing the restrictions that listing would impose on their ability to mine under the permits. During the administrative listing process under the National Historic Preservation Act, the mining companies repeatedly represented that listing the Battlefield in the National Register would impair their "expectation of developing" the coal in the nomination area. [A.R. 246].

For purposes of standing, the case law in this and other Circuits recognizes that the issuance of a permit is sufficient to demonstrate that injury is imminent if the permit gives the permittee *the ability* to undertake activities that could harm protected resources. *See, e.g., Nat'l Parks Conservation Ass'n v. Manson,* 414 F.3d 1 (D.C. Cir. 2005) (upholding standing where a federal action allowed a state regulator to approve a permit application that would result in emissions); *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation and Enforcement,* 620 F.3d 1227, 1233 (10th Cir. 2010) (injury "results from [the mine operator's] *ability* to commence mining operations") (emphasis added). As

19

the Supreme Court has held, " '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.' " *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)). Profit-making companies do not invest considerable resources in vigorously acquiring, protecting, and renewing permits to mine simply to shelve those permits. *See Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 658 (7th Cir. 2011) (finding "it must be likely" that company which expended resources in securing permit would eventually secure all required permits, and that injury to plaintiff was therefore imminent).

  To support its decision, the District Court principally cited two previous decisions in this Circuit: *Grassroots Recycling Network v. EPA,* 429 F.3d 1109, 1112 (D.C. Cir. 2005), and *Louisiana Envtl. Action Network v. Browner,* 87 F.3d 1379 (D.C. Cir. 1996). In these cases, however, a series of actors had to take multiple steps – each uncertain – before injury could occur. The present case is far different. Here, the record establishes that (1) mining companies have already sought and received SMCRA permits from the West Virginia Department of Environmental Protection authorizing mining operations within the Blair Mountain

20

Battlefield, (2) they intend to continue to seek and exploit such permits, and (3) the Department will continue to issue and renew such permits. The record further shows that mining activities would damage and even destroy historic artifacts and features that contribute to the historic significance of the Battlefield.

The second requirement for standing – causation – quickly follows from the imminent injury. De-listing the Battlefield from the National Register removed two of SMCRA's critical regulatory protections for the Battlefield. First, SMCRA presumptively prohibits surface coal mining that will adversely affect any sites listed in the National Register, unless specifically authorized by the agency with jurisdiction over the protected site. 30 U.S.C. § 1272(e)(3); *see also* 30 C.F.R. §§ 761.11(c), 761.17(d): W. Va. Code R. § 38-2-3.17.c. Second, even if agency officials with jurisdiction authorize or consent to mining, West Virginia's surface mining regulations mandate that all adverse impacts *must be minimized* within areas listed in the National Register of Historic Places.  W. Va. Code R. § 38-2-3.17.c. (emphasis added).[12]

---

[12] SMCRA establishes a regulatory structure, largely carried out by the states, that governs the surface effects of coal mining. See 30 U.S.C. §§ 1201(c), 1202(g). SMCRA charges the Secretary of the Interior with the task of reviewing and either approving or disapproving delegated State regulatory programs for the control of surface coal mining. 30 U.S.C. § 1253. The

These regulatory protections to National Register-listed sites apply to existing permits. They also would apply to any new or renewal permit applications submitted after March 30, 2009 – the date that Blair Mountain was listed in the National Register. However, because of the Keeper's unlawful removal of the Battlefield from listing in the National Register, those permit applications no long face a major legal barrier to their issuance under SMCRA.

As a result, there is a direct causal link between the Keeper's de-listing and the West Virginia Department of Environmental Protection's authorization of destructive mining within the Battlefield. The requirement that mining companies minimize adverse impacts to historic sites and the presumptive prohibition on mining no longer apply to mining activities within the Battlefield. *See, e.g., Nat'l Parks Conservation Ass'n*, 414 F.3d at 6 (recognizing injury caused by a federal agency's decision that alters the legal regime governing a permitting decision by a state agency).

Finally, a court order would redress this injury by automatically reinstating the two regulatory protections for the Battlefield. As this Court held in the *National Parks* case,

Secretary cannot approve a State program unless "the State's laws and regulations are in accordance with the provisions of the Act and consistent with the requirements of the Chapter." 30 C.F.R. § 732.15(a). West Virginia received federal approval for its regulatory program in 1981.

22

> A district court order setting aside Interior's [action] would
> significantly affect these ongoing [state agency] proceedings.
> That is enough to satisfy redressability. "A significant increase
> in the likelihood that the plaintiff would obtain relief that
> directly redresses the injury suffered" will suffice for standing.

*National Parks*, 414 F.3d at 7 (*quoting Utah v. Evans,* 536 U.S. 452, 464

(2002)).

In sum, the Coalition clearly satisfies the legal requirements for

standing, and the District Court's decision dismissing the Coalition's action

must be reversed.

## STANDARD OF REVIEW

Courts in the District of Columbia Circuit review *de novo* a District

Court's standing decision. *Equal Rights Ctr. v. Post Properties, Inc.*, 633

F.3d 1136, 1138 (D.C. Cir. 2011); *see also Affum v. United States*, 566 F.3d

1150, 1158 (D.C. Cir. 2009); *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098,

1100 (D.C. Cir. 2005).

In this Court's review of a grant of summary judgment, the test to be

applied is:

> [S]ummary judgment is proper only when there is no genuine
> issue of any material fact or when viewing the evidence and the
> inferences which may be drawn therefrom in the light most
> favorable to the adverse party, the movant is clearly entitled to
> prevail as a matter of law.

23

*Pub. Citizen v. U.S. Dist. Court for Dist. of Columbia*, 486 F.3d 1342, 1345

(D.C. Cir. 2007); *see also Sherwood v. Washington Post*, 871 F.2d 1144,

1145 (D.C. Cir. 1989) ("[a] summary judgment is upheld on appeal only

where there is no genuine issue of material fact and, viewing the evidence in

the light most favorable to the appellant, the appellee is entitled to prevail as

a matter of law"). Further, in addressing the threshold question of the

Coalition members' standing to bring suit, this Court must also assume that

the Coalition "will succeed on the merits." *Karst Envtl. Educ. & Prot., Inc. v.

EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007).

## ARGUMENT

**I.    The Coalition and its members suffered injury in fact when the
Battlefield was improperly removed from listing in the National
Register because the legal protections from mining provided by
that listing no longer apply.**

In *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167,

180-81 (2000), the Supreme Court held that, to satisfy Article III's standing

requirements, a plaintiff must establish:

> (1) an 'injury in fact' which is (a) concrete and particularized and (b)
> actual or imminent, not conjectural or hypothetical; (2) the injury is
> fairly traceable to the challenged action of the defendant; and (3) it is
> likely, as opposed to merely speculative, that the injury will be
> redressed by a favorable decision.

(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Here,

the Coalition satisfies all three elements of this test.

24

A.   **The Coalition's members have a concrete and particularized interest in the historic resources of the Battlefield.**

"Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc.*, 528 U.S. at 183 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)). This Court has found standing where the alleged injury was "what plaintiffs see as damage to an historic site they visit and enjoy." *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008). In litigation alleging injury from destruction that mining operations will cause, a plaintiff organization need only show that (1) its members engage in activities such as "scientific study," "aesthetic appreciation," and "sightseeing" on the land that the mining will affect, and (2) it "claim[s] that the proposed mining operations would impair many, if not all, of these uses." *S. Utah Wilderness Alliance*, 620 F.3d at 1234 (recognizing that "[t]his is the type of injury that has often been used to demonstrate standing").

Members of the Coalition groups submitted affidavits declaring that they use, enjoy, and study the Blair Mountain Battlefield area and its historic resources. [Docs. 23-3 to 23-8]. Members have visited the Battlefield's historic locations for personal purposes ([Doc. 23-3 (Hendrix Decl.), ¶ 12;

25

Doc. 23-5 (Martin Decl.), ¶ 9]), as well as for professional purposes ([Doc. 23-4 (Ayers Decl.), ¶¶ 7-9; Doc. 23-6 (Rasmussen Decl.), ¶¶ 1-2]). For example, Declarant Nell Ziehl has accompanied staff of the West Virginia Division of Culture and History to the battlefield "to examine the topography, earthworks and defense locations, and archaeological artifacts." [Doc. 23-8, ¶ 5]. Dr. Harvard Ayers has visited "14 archaeological sites along a 10 mile battle front." [Doc. 23-4, ¶ 8]. And Julian Martin has "discovered artifacts from the battle and observed the earthworks used for defensive cover from gun fire" as well as "driven across Blair [M]ountain twenty times or more." [Doc. 23-5, ¶ 9].

Moreover, members of the Coalition need not actually walk on the site to establish their particularized interest. "If an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact." *Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001). As the *Cantrell* Court explained, no requirement exists that a plaintiff "show that he has a right of access to the site on which the challenged activity is occurring, or that he has an absolute right to enjoy the aesthetic or recreational activities that form the basis of his concrete interest." *See also Friends of the Earth, Inc.*, 528 U.S. at 182 (finding injury

established by affidavits of members who enjoyed a river from the surrounding land).

In addition to using the Battlefield, the Coalition groups and their members possess aesthetic interests in the "integrity and cohesiveness" of the historic Battlefield, and these interests also supply a basis for standing. *See Pye v. United States*, 269 F.3d 459, 469 (4th Cir. 2001) (holding that adjacent landowners who expressed aesthetic interest in historic sites had standing to challenge federal action threatening those sites). Coalition group members seek to preserve the historic Battlefield site in a way that allows future generations to learn about and experience the story of this important event in United States history. *See*, *e.g.*, [Doc. 23-5 (Martin Decl.), ¶¶ 10-12; Doc. 23-7 (Simmons Decl.), ¶¶ 6-7; Doc. 23-8 (Ziehl Decl.), ¶ 7]. For example, one member declared that "My grandfather fought there and I consider it to be sacred ground both in terms of my family history and the larger state and national historical significance of the 1921 battle." [Doc. 23-5 (Martin Decl.), ¶ 11].

This undisputed evidence proves the required "interest" that a plaintiff must demonstrate to have standing.

**B.    The threat of injury to the Coalition's interests is actual and imminent, because the de-listing of the Battlefield, combined with the permits issued to mine operators, establishes a substantial probability that historic Battlefield resources will be destroyed.**

In the District of Columbia Circuit, a "substantial (if unquantifiable) probability of injury" shifts injury from "conjectural" to "imminent." *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010) (quoting *DEK Energy Co. v. FERC,* 248 F.3d 1192, 1195 (D.C. Cir. 2001)); *see also Chamber of Commerce of U.S. v. E.P.A.*, 642 F.3d 192, 200 (D.C. Cir. 2011) ("to 'shift injury from conjectural to imminent,' the petitioners must show that there is a substantial . . . probability of injury"). That substantial probability exists in the present case.

The Keeper's decision removed the legal protections from adverse mining impacts that SMCRA extends to historic sites listed in the National Register of Historic Places. Consequently, because mine operators hold mining permits that include portions of the Battlefield and actively seek permits to mine within Battlefield areas, destruction of historic resources at the Battlefield is substantially probable, and thus imminent.

As noted above, the Coal Company Objectors or their subsidiaries currently hold three permits that authorize mining within the Battlefield area, and they are seeking approval for a fourth. Arch Coal subsidiary Mingo

Logan Coal Company holds permits for the Adkins Fork and Bumbo No. 2 mines, both of which overlap the Battlefield. [A.R. 1471; Doc. 30-2 at 182-83, 194-96]. Moreover, the company is acting to protect its current right to mine these areas. It secured a permit renewal for the Adkins Fork mine in February 2013[13] and a permit renewal for the Bumbo No. 2 mine in April 2010.[14] Additionally, Aracoma Mining holds a permit for the Camp Branch mine, which also overlaps the Battlefield. [Doc. 30-2 at 191-92]. Aracoma renewed that permit as recently as 2012.[15]

All three of these permit renewals occurred after the defendants' unlawful removal of the Battlefield from the National Register. Absent the defendants' actions, the permits would have been subject to a much more stringent legal standard.

Aracoma is also pursuing another permit that will overlap the Battlefield. Aracoma submitted a permit application for the Piney Branch mine in November 2008 and most recently resubmitted its application in November 2012.[16]

---

[13] WV DEP permit database website entry for permit S500503.
[14] WV DEP permit database website entry for permit S504991.
[15] WV DEP permit database website entry for permit S501390.
[16] WV DEP permit application database, application milestones website entry for permit S503508.

The existence of these permits, the associated actions to protect and renew them, and the efforts to secure an additional permit demonstrate the required "substantial probability of injury" for standing. *See Sherley*, 610 F.3d at 74. By expending considerable resources securing, renewing, and applying for permits to conduct mining operations within the Blair Mountain Battlefield area, the Coal Company Objectors evidenced their intent to mine the Battlefield in the near future.

The Objectors further confirmed their intent to mine the Battlefield surface area through their zealous and repeated objections to the listing of the Battlefield in the National Register. [A.R. 877 (March 7, 2008 objection), A.R. 244 (February 27, 2009 objection), A.R. 299 (March 27, 2009 objection), A.R. 313 (March 30, 2009 objection), A.R. 466-67 (May 22, 2009 objection)]. These objections document the companies' understanding that listing in the National Register would substantially constrain and restrict their present plans to mine coal within the Battlefield. The Objectors declared their "acute interest in the nomination" because they "own[] or lease[] minerals, particularly coal, with the expectation of developing them in the nomination area." [A.R. 246]. The Objectors stated that they "[c]ollectively . . . own the vast majority of the surface and minerals in the nomination area." [A.R. 246]. They acknowledged that listing would

30

interfere with their plans to mine coal within the Battlefield because "[t]he Keeper's own regulations recognize the legal significance that listing has on coal resources; 36 C.F.R § 60.2(d)."[17] [A.R. 246].

The historic resources at the Battlefield include topographical features such as ridges and hilltops where guns were mounted, and earthworks that were used as defensive cover. [*See* Doc. 23-5, ¶ 9; Doc. 23-8, ¶ 5]. Numerous artifacts from the Battle remain in the topsoil. [Doc. 23-4, ¶ 11]. Because surface coal mining activities on mountain tops and ridgelines involve large amounts of blasting and earthmoving, those activities will inevitably destroy important topographic features. [*See* Doc. 14, ¶ 33; Doc. 23-8, ¶ 5]. The actions also will destroy artifacts such as buttons, firearms, ordnance, and shell casings within the Battlefield area. [*See id*.]. The mining activities will therefore substantially change the Battlefield's ability to convey the historical events for the use and appreciation of Coalition members, and they will impair the ability of historians and archaeologists to study the historical events that took place on this site.

---

[17] The coal industry's efforts to prevent listing of the Battlefield on the National Register have continued during the pendency of this appeal. The West Virginia Coal Association – which includes "owners and lessors of coal interests who control the majority of land within the proposed boundary of Blair Mountain nomination area" – filed an amicus curiae brief before the District Court in support of the defendants' action de-listing the Battlefield, and has indicated its intent to file an amicus brief in this Court. [Doc. 35 at 2].

The Government has submitted no evidence in the record that disputes this threatened harm. Nor did the District Court suggest that these activities will not injure the Coalition and its members.

Accordingly, the actions of the Coal Company Objectors demonstrate that injury is imminent. The Objectors would not expend such considerable resources on securing permits, renewing permits, and relentlessly opposing the National Register listing if they did not intend to mine the Battlefield in the near future.[18]

_____

[18] The facts described in this section demonstrate that the Coalition has met its burden to " 'set forth' by affidavit or other evidence 'specific facts' to survive a motion for summary judgment." *See Bennett v. Spear*, 520 U.S. 154, 168 (1997) (quoting Fed. R. Civ. Proc. 56(e)). The government, which disputes the Coalition's standing, has introduced no facts to contradict these assertions, and therefore has not met its burden of showing "that there exists no genuine issue of material fact" as to the Coalition members' standing. *See Dep't of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 329 (1999).

Because the Coalition has set forth specific facts supported by affidavits and other evidence that support its claims of standing, this Court must find that the Coalition has standing to pursue its claims. In the alternative, if this Court finds that there is a genuine issue of material fact as to the imminence of mining within the Battlefield, it must remand the matter back to the District Court for additional proceedings to develop and resolve facts pertinent to the Coalition members' standing.

C.   **The District Court's focus on whether mining has actually started on the Battlefield conflicts with settled case law on standing and illogically assumes that applicants vigorously seeking permits do not intend to use them.**

Despite this evidence, the District Court refused to find that mine operators who hold and affirmatively renew permits within the Battlefield intend to begin mining imminently. This conclusion conflicts with the approach taken in other cases which, quite logically, have presumed that applicants who vigorously seek permits will thereafter undertake the permitted activity. The District Court's approach would allow a plaintiff to establish standing only by securing a company's admission as to the precise time and place that it intends to begin mining under its existing permits. Under the relevant case law, however, imminent injury is established here because the companies possess and continue to seek permits giving them the ability to carry out their expressly stated intention to mine the coal resources within the Battlefield.

The Tenth Circuit addressed a similar mining situation in *Southern Utah Wilderness Alliance v. Office of Surface Mining Reclamation and Enforcement*, *supra,* 620 F.3d 1227. The court held that the plaintiff satisfied the injury-in-fact prong for standing, including the "imminent injury" requirement, because the challenged government actions effectively allowed a permitted mining project to proceed on federal land used by plaintiff's

33

members. Rather than inquiring into whether and when the permit holder would actually begin mining, the court held that the plaintiff's injury "results from [the mine operator's] *ability* to commence mining operations." *Id*. at 1233 (emphasis added). That holding is consistent with the principle, repeatedly confirmed by the Supreme Court, that " '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.' " *Babbitt v. United Farm Workers Natl. Union*, 442 U.S. 289, 298 (1979) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)).[19]

In *Southern Utah Wilderness Alliance*, the court affirmed the plaintiff's standing to challenge a decision by the Bureau of Land Management tolling the period during which the mine operator must begin producing coal or forfeit its federal leases. 620 F.3d at 1231. The tolling decision thereby affected whether and how any authorized mining could proceed. In affirming standing, the court emphasized the close connection between the tolling decision and the injury: "[T]he decision by BLM that

---

[19] Because "standing is assessed as of the time a suit commences" (*Del Monte Fresh Produce Co. v. United State*s, 570 F.3d 316, 324 (D.C. Cir. 2009)), it is irrelevant that the mine operator in *Southern Utah Wilderness Alliance* began "beneficial use of the leased land" after the appeal began (620 F.3d at 1233-34).

34

[the mine operator's] federal leases are still valid directly leads to the injury of which [the Alliance] complains." *Id*. at 1234.

The same reasoning applies to the analogous facts in the present appeal. Just as the tolling decision in *Southern Utah* led to imminent injury by extending a time limit on mining, here the decision to de-list the Battlefield leads to imminent injury by removing important legal protections from the site's historic resources.

SMCRA provides that "no surface coal mining operations . . . shall be permitted . . . which will adversely affect any . . . places included in the National Register of Historic Sites unless approved jointly by the regulatory authority and the Federal, State, or local agency with jurisdiction over . . . the historic site." 30 U.S.C. § 1272(e)(3); *see also* 30 C.F.R. §§ 761.11(c), 761.17(d). West Virginia's surface mining regulations include an equivalent prohibition, empowering the State Historic Preservation Officer to object to new mining permits that may adversely affect a listed site. W. Va. Code R. §§ 38-2-3.17.c and 38-2-3.19. [20] Because the Battlefield is no longer listed in the National Register, the protections provided by Section 1272(e)(3) of

---

[20] *Cf.* 23 C.F.R. § 774.17 (stating that the State Historic Preservation Officer is the "[o]fficial[] with jurisdiction" over National Register sites impacted by federal highway projects); *see also* 77 Fed. Reg. 42,802, 42,804 (Federal Highway Administration policy paper stating that "[i]n the case of historic sites, the official[] with jurisdiction [is] the State Historic Preservation Officer.")

SMCRA and West Virginia Code of Regulations Section 38-2-3.17.c  no

longer apply.

Furthermore, even if the State Historic Preservation Officer authorizes

or consents to the mining, another important legal protection remains in

effect. All adverse impacts *must be minimized* within areas that are listed in

the National Register of Historic Places. West Virginia's surface mining

regulations mandate:

> Adverse impacts to any publicly owned park and any place
> listed on the National Register of Historic Places shall be
> prohibited unless the permit applicant has valid existing rights
> or unless joint agency approval is obtained in accordance with
> subsection 3.19 of this section. In either case *all adverse
> impacts must be minimized*.

W. Va. Code R. § 38-2-3.17.c. (emphasis added).

Thus, because the Keeper removed the Battlefield from the National

Register, the ability of the mining companies to secure or renew mining

permits is no longer constrained by the stringent legal protections that apply

to National Register-listed sites.

> **D.    A federal agency decision supplies the requisite injury for
> standing if it weakens existing legal protections applied by
> state agencies.**

In *National Parks Conservation Association,* 414 F.3d 1, this Court

has adopted an approach similar to *Southern Utah* in considering the

relationship between permits and imminent injury. The approach presumes

that (1) a company seeking a permit intends to engage in the permitted activity and, consequently, (2) a plaintiff needs no additional showing of imminence to establish standing to challenge a government decision that impacts the project's ability to move forward. *Nat'l Parks Conservation Ass'n*, 414 F.3d 1.

In *National Parks*, this Court addressed the standing of plaintiff organizations to challenge a decision by the Department of the Interior. The Department's decision withdrew a finding that a proposed power plant's emissions would impair air quality at Yellowstone National Park and at a nearby wilderness area regularly used by the plaintiffs' members. *Id*. at 3-4. Withdrawal of that finding allowed a state regulator to approve the power plant's permit application under the Clean Air Act, thereby authorizing emissions that would impact the park and wilderness area. *Id*.

In upholding the plaintiffs' standing, the Court's analysis focused on the legal relationship between the federal decision and the state-issued permit. Assuming that the power plant's owner sought the permit so the plant could operate and that it would begin emitting when it received its final permit, the court held that the Department's action causally related to the state agency's decision. *Id*. at 6 (terming Interior's withdrawal of the letter "virtually dispositive of the state permitting decision"). This Court never

37

questioned whether the injury resulting from the issuance of that permit was imminent. Instead, it simply concluded that "National Parks suffers a cognizable injury from environmental damage to those lands." *Id*. at 4.

Again, the facts of the present case are very similar. If the Battlefield's National Register listing were restored, the legal protections provided by Section 1272(e)(3) of SMCRA and West Virginia Code of Regulations Sections 38-2-3.17.c and 38-2-3.19 would again limit *all* mining operations within the Battlefield – including currently permitted operations. Just as the federal action in *National Parks* led to the state permit, the federal action challenged here cleared the way for a state agency, the West Virginia Department of Environmental Protection, to issue new permits and renew existing permits for mining. Because the Battlefield is no longer listed, those permits will allow mining companies to commence operations without the important legal protections previously in place, and thus injure the interests of the Coalition's members.

Accordingly, the District Court's decision holding that injury was not imminent is squarely inconsistent with *National Parks* and *Southern Utah*. In those cases the plaintiffs established standing based solely on a showing that the state permitting agency was *considering* the issuance of a permit that would *authorize* actions harming protected resources. Here, those state

38

permits already exist, and they were renewed subsequent to the defendants'
unlawful action. If injury was imminent in those cases, it must be imminent
here as well.

The Seventh Circuit also has found injury sufficient to establish a
plaintiff's standing, even when additional permits were still needed for the
harmful activity to go forward. In *American Bottom Conservancy v. U.S.
Army Corps of Engineers*, 650 F.3d 652 (7th Cir. 2011), the plaintiff
challenged a permit authorizing the destruction of a wetland, an action that
was a precursor to construction of a landfill. Before the landfill could be
built, the applicant had to secure two additional state permits. Nonetheless,
the court found that the plaintiff had established "a probable injury from the
landfill" sufficient to establish standing. *Id.* at 658.

The Court did not cite any specific evidence of when the permit
applicant intended to begin constructing the landfill. To the contrary, the
Court explicitly recognized that "it is not certain that Waste Management
will obtain the required [state] permit[s]" to actually build the landfill. *Id.*
Nonetheless, the court found that the receipt of the ultimate permit:

> must be likely, for Waste Management must have spent a great
> deal of money designing the landfill, obtaining the Corps of
> Engineers permit (plus another permit it needed, from the City
> of Madison, called 'local siting approval,' . . .), and prosecuting
> its permit application before the [state agency].

*Id.* (internal citations omitted). Accordingly, the court reasoned, "a judgment in the plaintiffs' favor in the present lawsuit would eliminate a probable injury from the landfill. No more is necessary to establish standing." *Id.*

In the present appeal, as discussed above in Section D of the Statement of Facts, two mining companies already possess three permits between them authorizing mining within the Battlefield, and they are actively pursuing a fourth. Just like the landfill developer in *American Bottom Conservancy*, these companies have spent a great deal of money designing the mines, obtaining the SMCRA permits, and prosecuting the additional SMCRA permit application. *See id.* Further, because SMCRA requires a permittee to commence mining operations within three years of permit issuance or risk losing the permit, the mining companies have a powerful incentive to begin mining sooner rather than later. *See* W. Va. Code § 22-3-8(a)(3). Accordingly, all three factors – the existing permits, the companies' efforts to renew the permits and seek a new permit, and the SMCRA three-year deadline – establish that injury from mining within the Battlefield is a "substantial probability" and "certainly impending." *See Sherley*, 610 F.3d at 74; *Babbitt*, 442 U.S. at 298.

40

E.     The decisions relied on by the District Court involved more remote action and considerably more conjecture than are present in this case.

The District Court relied principally on two decisions that declined to find an injury-in-fact sufficient to confer standing: *Grassroots Recycling Network v. EPA*, 429 F.3d 1109, 1112 (D.C. Cir. 2005), and *Louisiana Environmental Action Network v. Browner*, 87 F.3d 1379 (D.C. Cir. 1996). Neither decision, however, involved facts like those in the present case, where the Coalition's injury stems from the imminent destruction of a specific place by specific actors who hold permits authorizing that destruction. Instead, both decisions relied on by the District Court concerned challenges to federal regulations giving federal agencies authority over state permitting proceedings, where no specific evidence showed that any state permitting proceedings had been initiated. The Supreme Court's recent decision in *Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013), is distinguishable for the same reason.

All three of these cases involved speculative leaps that were essential to establish standing. The injury alleged in these cases was not definite because it was highly uncertain whether, where, or when the challenged federal action would actually injure a specific plaintiff or plaintiff's member.

In contrast, the challenged federal action in the present case has already been applied to the Coalition's detriment.

For example, in *Grassroots Recycling Network*, the plaintiff challenged a rule allowing the director of a state permitting program for landfills to issue certain permits granting variances from criteria for sanitary landfills. 429 F.3d at 1110. The plaintiff asserted injury on behalf of two members who lived "approximately 1.5 miles from a landfill in a Wisconsin town." *Id*. at 1112. The members claimed that they would not or might not have purchased their respective homes if they had known that a nearby landfill could become a "bioreactor," i.e. a landfill that uses liquid to increase biodegradation. *Id*.

The Court identified at least five steps that the government or third parties would have to take before the challenged rule could reduce the value of property owned by plaintiff's members: (1) the state agency would have to approve the proposed rule; (2) EPA would have to approve the proposed rule; (3) the owner of a landfill near the members' home would have to apply for a permit under the rule; (4) the state would have to issue the permit; and (5) the housing market then would have to respond to the permit's issuance by decreasing the fair market value of the members' homes. *Id*. Not only did that chain of events require the independent actions

42

of multiple agencies and third parties, it remained uncertain whether the regulation would *ever* impact either of the landfills identified by the plaintiff's members. Moreover, the final step in the chain depended entirely on the notoriously fickle operation of the housing market.

Faced with this chain of future events needed to establish an injury, the Court characterized it as "multi-tiered speculation" which "instances events that, although by no means impossible, are at this time neither actual nor imminent but wholly conjectural." *Id*. Such speculation could not support standing. Here, by contrast, the record establishes that the mining companies have already sought and received permits to conduct mining activities within the Blair Mountain Battlefield. Those permits require mining activities to commence within three years. No evidence has been submitted that in any way rebuts the specific showing made by the Coalition that mining activities will harm the Battlefield and thus result in injury to the Coalition's demonstrated interests in the Battlefield's preservation.

The decision in the second case relied on by the District Court, *Louisiana Environmental Action Network,* invoked similar speculation about whether or when any actual injury would occur as a result of the challenged federal rule. In this decision the plaintiff organizations challenged an EPA rulemaking that implemented amendments to the Clean Air Act. Those

43

amendments allowed EPA to delegate to a state its authority over various air pollution requirements. 87 F.3d at 1379. As the court described it, the plaintiffs theorized that they would be injured in the following way:

> [B]ecause the delegation rules permit the EPA not to enforce federal air-pollution standards in a particular state *as soon as* the EPA approves that state's *proposed* program, the rules permit a potentially harmful enforcement gap if a state seeks section 7412 approval prior to that state putting its proposed program into effect.

*Id*. at 1382 (emphasis in original).

This Court rejected the theory as insufficient to establish injury. As in *Grassroots Recycling Network,* the injury alleged by the plaintiffs required the future completion of at least five speculative steps: (1) a state would have to seek delegated authority from EPA; (2) the state's program could not be in effect when it sought that delegation from EPA; (3) EPA nevertheless would have to approve the delegation; (4) the resulting "enforcement gap" would have to occur at a specific location actually frequented by the plaintiffs' members; and (5) the enforcement gap would have to result in air emissions that injure plaintiffs' members. *Id*. at 1383. The court concluded that this "multi-tiered speculation" – which involved actions by two independent agencies and required plaintiffs' members to suffer injury by being in the wrong place at the wrong time – defeated the claim of standing. *Id*.

44

Again, the facts in the present case are significantly different. Unlike the multiple steps required in *Grassroots Recycling Network* for injury to occur, here the mining companies have repeatedly sought *and received* permits to conduct mining operations within the Battlefield. The Keeper's action removing the Blair Mountain Battlefield from listing in the National Register has materially affected the nature of the mining activities that the mine operators can carry out on the Battlefield under these permits. It has also affected the potential for additional permits to be issued in the future.

Finally, the Supreme Court's recent 5-4 decision in *Clapper* falls squarely into the same line of "multiple speculation" cases. The Court denied plaintiffs' standing to challenge an amendment to the Foreign Intelligence Surveillance Act. In doing so, the Court identified five steps in what it termed a "highly attenuated chain of possibilities": (1) that the government will imminently target plaintiffs' foreign contacts for surveillance; (2) that the government will seek to authorize that surveillance under the challenged amendment; (3) that the Foreign Intelligence Surveillance Court will authorize the surveillance; (4) that the government will succeed in acquiring the contacts' communications; and (5) that the acquired communications will include plaintiffs' communications. *Clapper*, 133 S. Ct. at 1148.

45

Thus, the injury alleged by the plaintiffs in *Clapper* depended on independent actions by both the government and the Foreign Intelligence Surveillance Court. At the same time, it required dual suppositions: that the surveillance would be effective and then, once effective, would capture a particular set of communications that happened to include those of the plaintiffs. Given this improbable sequence of events, Plaintiffs could not establish whom the statute would impact, where and when that impact would occur, or even whether it would occur at all. *See id*. at 1150.

In contrast to the theoretical injuries in these three cases, the Coalition's injury is both definite and specific. The injury will result from destruction of portions of the Battlefield that will occur when the mining companies exercise their rights to strip mine coal which they *now* own or lease, and for which they *now* possess or actively seek mining permits.

Moreover, the sequence of events at issue in the present case is far more immediate and far more certain than those in *Grassroots Recycling Network*, *Louisiana Environmental Action Network*, or *Clapper*. After the decision to remove the Battlefield from listing, only one step is needed to injure the plaintiff: the mining companies holding permits simply need to begin mining within the Battlefield. Because the Battlefield has been removed from the National Register, the requirement of West Virginia state

46

law that mine operators minimize adverse impacts to the Battlefield no longer applies. Any of the three existing mining operations – the Adkins Fork, Bumbo No. 2, and Camp Branch mines – may now undertake mining without the legal protections that apply to listed properties.

The sequence of events leading to injury from operations not yet permitted, such as the Piney Branch mine, is only slightly longer. Removal of the Battlefield from the National Register eliminated the ability of historic preservation officials to block or modify a permit under West Virginia Code Section 38-2-3.17.c. Consequently, the West Virginia Department of Environmental Protection will continue issuing SMCRA permits that authorize mining within the Battlefield, and mining companies in turn will engage in the authorized mining and destroy historic resources on the site.

In sum, the sequence of events leading to injury in this case is definite, closely linked, and concrete. The presence of mineral rights, mining permits, and permit applications renders actual mining – and therefore injury to the Coalition members from destruction of historic resources – imminent rather than the product of "multi-tiered speculation." As the discussion of the case law above confirms, it is not speculative to assume that a permit holder or permit applicant will engage in the very activity for which it acquired or is

47

seeking a permit. *See S. Utah Wilderness Alliance*, 620 F.3d at 1233; *Nat'l Parks Conservation Ass'n*, 414 F.3d at 6.

**II.    The destruction of historic resources on the Battlefield and the resulting injury to the Coalition is fairly traceable to the federal defendants' erroneous decision to remove the Battlefield from the National Register.**

**A.    The decision to de-list the Battlefield removed important regulatory protections for the Battlefield area.**

The second prong in the standing inquiry, causation, requires a plaintiff to show that the alleged injury is "fairly traceable to the challenged action of the defendant." *Friends of the Earth*, 528 U.S. at 180. To satisfy the "fairly traceable" requirement, a defendant's action need not be "the very last step in the chain of causation." *Bennett*, 520 U.S. at 168-69. This principle particularly applies where the injury is "produced by determinative or coercive effect upon the action of someone else," such as by a decision that "alters the legal regime to which the action agency is subject." *Id.* at 169; *see also Nat'l Parks Conservation Ass'n*, 414 F.3d at 6.

When the Keeper removed the Battlefield from the National Register, this decision markedly altered the legal regime for current and future SMCRA permits that include portions of the Battlefield. If the Battlefield is listed in the National Register, then the protections provided to historic resources by West Virginia Code of Regulations Sections 38-2-3.17.c and

48

38-2-3.19 apply. Section 38-2-3.17.c requires that, at the very least, mine operators must minimize all adverse impacts to historic resources. In turn, this section and Section 38-2-3.19 authorize the agency with jurisdiction over a National Register site to block or modify a new permit to mine that site. Because the Keeper removed the Battlefield from the National Register, these two key protections no longer apply, and the three existing mining permits were all renewed without the benefit of those stringent protections.

Indeed, the Coal Company Objectors have readily acknowledged the important effect that listing has on SMCRA's regulatory regime. Their objection to listing the Battlefield noted that "[t]he Keeper's own regulations recognize the legal significance that listing has on coal resources," citing 36 C.F.R. § 60.2(d). [A.R. 246]. This federal regulation states that "[i]f a property contains surface coal resources and is listed in the National Register, certain provisions of the Surface Mining and Control Act of 1977 require consideration of a property's historic values in the determination on issuance of a surface coal mining permit." 36 C.F.R. § 60.2(d).

Moreover, the mining companies have never wavered in their intent to mine the Battlefield site. The Coal Company Objectors vigorously opposed listing, citing concerns over the effect that listing would have on their ability to mine. [A.R. 244, 246]. Following the de-listing, the companies renewed

49

their existing permits that cover portions of the Battlefield, and they have

continued to seek at least one new permit. Accordingly, the removal of the

Battlefield rendered it far easier to mine the Battlefield and thereby injure

the Coalition's members, and this injury is "fairly traceable" to the

weakening of regulatory protections that automatically followed the removal.

In *National Parks Conservation Association v. Manson, supra*, this

Court considered a similar change in legal regime. As discussed above, the

issue was whether plaintiff organizations had standing to challenge a

decision by the Interior Department to withdraw a letter and report

previously issued. Those documents had raised concerns about a Montana

agency's draft air pollution permit for a proposed power plant. 414 F.3d at 3-

4. Under the federal Clean Air Act, the withdrawal eliminated the

requirements that the state "consider the report before proceeding" and

"justify its decision in writing if it disagreed with the federal report." *Id*. at 6.

The government argued that the plaintiff lacked standing because the

state agency was an "independent actor" that broke the causal chain between

the federal agency's withdrawal of the documents and any subsequent injury.

*Id.* at 6. This Court rejected the argument, holding that the plaintiffs satisfied

the causation requirement of Article III standing. The Court reasoned that

the federal regulations and the Montana air quality regulations were

50

intertwined such that "the challenged federal action 'alters the legal regime to which the [local] agency action is subject.' " *Id.* (quoting *Bennett v. Spear*, 520 U.S. at 169) (alterations in the original)). The court summarized:

> Had Interior not withdrawn its adverse impact report, the Montana [agency] would have been bound to consider that report before proceeding with its permitting decision and, crucially, would have been required to justify its decision in writing.

*Id.* Because the Interior Department exerted this legal authority over the Montana agency, that agency "is therefore not the sort of truly independent actor who could destroy the causation required for standing." *Id.*

For the same reasons, when the Battlefield was listed in the National Register, the National Historic Preservation Act and SMCRA regulations became intertwined – just like the federal and state law in *National Parks*. As noted above, SMCRA and West Virginia's surface mining regulations provide important protections for historic sites listed in the National Register. 30 U.S.C. § 1272(e)(3); *see also* 30 C.F.R. §§ 761.11(c), 761.17(d); W. Va. Code R. § 38-2-3.17.c. Historic sites not listed in the Register are not afforded any equivalent protections from mining impacts.

As a result, the state mine-permitting agency – the West Virginia Department of Environmental Protection – is not an "independent actor" in this case. Had the Department attempted to issue or renew a mining permit

51

when the Battlefield was listed, federal and state law would have required it

to consider both the Battlefield's historic status and any objections to the

permit from preservation agencies. W. Va. Code R. § 38-2-3.17.c. At the

same time, the National Register listing triggered a mandate for the mine

operators to modify their mining plans to minimize adverse impacts to the

Battlefield's historic resources. *Id.*

However, when the Keeper de-listed the Battlefield, she thereby

altered this legal relationship and deprived the Battlefield of crucial

protections from mining activities. The Keeper's action substantially

increased the probability that the mining companies would receive or retain

permits that authorize destruction of Battlefield resources – and three of

those permits have subsequently been renewed. Accordingly, the injury to

the interests of the Coalition members from the authorized mining is "fairly

traceable" to the Keeper's decision. *See Friends of the Earth*, 528 U.S. at

180.

### B.     The cause of the injury from weakening the protection for the Battlefield is neither speculative nor attenuated.

In granting the government's motion for summary judgment, the

District Court also relied heavily on one additional decision in discussing the

"fairly traceable" requirement: *Simon v. E. Ky. Welfare Rights Org*., 426 U.S.

26 (1976). The District Court used that decision to support the conclusion

52

that the alleged causation was insufficient to confer standing on the Coalition. [Doc. 42, 22-23]. However, the District Court's reliance on *Simon* was misplaced. The *Simon* case involved an overtly speculative and attenuated causal chain, and the regulatory relationships in that case did not include the type of intertwined legal regime present in *National Parks* and the instant case.

In *Simon*, groups representing low-income individuals challenged an IRS decision to reduce tax incentives for hospitals that offer free health care. 426 U.S. at 41-43. The plaintiffs argued that the IRS decision would reduce free health care for the poor. *Id*. The Supreme Court, however, held that the plaintiffs had failed to satisfy the causation prong for standing. It found that the connection between the IRS decision and the possible actions of the hospitals was speculative and attenuated, and that the IRS could neither anticipate nor control those actions. *Id*. The Court emphasized that "[i]t is purely speculative whether the denials of service specified in the complaint fairly can be traced to [IRS] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." *Id*. at 42-43.

In contrast, there is nothing speculative about how the Keeper's de-listing decision has impacted the SMCRA legal regime for mining permits

within the Battlefield. This Court's decision in *National Parks* fully supports

such a conclusion, for in *National Parks* the Court specifically distinguished

the facts in that case from those in *Simon*. The court noted that, while in

*Simon* the IRS had no authority over the hospitals, the *National Parks* case

involved a federal defendant empowered by statute to "exert legal authority"

over the state agency. 414 F.3d at 6. Specifically, the court found causation

where the federal agency "expects and intends its decision to influence the

[state] permitting authority." *Id*.

   Similarly, in the present case the National Historic Preservation Act

and SMCRA authorize the Keeper to change the SMCRA legal regime for

coal mines and permits within sites listed in the National Register, thereby

altering the protection for historic resources. This ability to change the legal

protections given to historic resources plainly distinguishes the present case

from *Simon*, where the IRS possessed no analogous authority.

**III.   An order restoring the Battlefield to the National Register will
       redress the Coalition's injury because statutes and regulations
       that control surface mining protect historic resources on sites
       listed in the National Register.**

   The third prong of the standing inquiry is redressability. *Friends of the

Earth,* 528 U.S. at 180-81. If a change in legal status creates "a significant

increase in the likelihood that the plaintiff would obtain relief that directly

redresses the injury suffered," that change in status will satisfy the redressability requirement. *Utah*, 536 U.S. at 464.

Here, the Coalition's injury results from the current likelihood that coal mining will destroy historic resources within the Battlefield. In this litigation the Coalition seeks to restore the Battlefield site to the National Register *nunc pro tunc* as of March 30, 2009. That change in the Battlefield's legal status to "listed" will automatically trigger the protections under SMCRA – summarized at length above – that will at least minimize any adverse impacts to historic resources on the Battlefield. In doing so, it will thereby redress the Coalition's injury.

The District Court incorrectly found that National Register listing would not redress the injury to Blair Mountain from mining activities. [Doc. 42 at 23-25]. To reach this conclusion, the Court assumed that previously-issued permits would constitute "valid existing rights" that would not be subject to SMCRA's regulatory protections for National Register-listed sites. [Doc. 42 at 24-25]. The District Court failed, however, to identify any facts in the record showing that valid existing rights have been established. [Doc. 42, at 24-25].The District Court's analysis also completely disregarded the requirement of West Virginia Code of Regulations Section 38-2-3.17.c that adverse impacts be minimized – a protection which explicitly applies even to

55

valid existing rights. But for the Keeper's decision removing Blair Mountain from the National Register, these permit renewals would have been subject to the mandate that all adverse impacts must be minimized within areas listed in the National Register. W. Va. Code R. § 38-2-3.17.c.

Even if this minimization requirement were somehow read to take effect only when incorporated into a permit – a proposition not explicit in the regulation – that incorporation would occur at each permit renewal. Here, all three existing permits that overlap the Battlefield were renewed after the site was listed on March 30, 2009. As discussed above in Section D of the Statement of Facts, the Adkins Fork permit was renewed in February 2013, the Bumbo No. 2 permit was renewed in February 2010, and the Camp Branch permit was renewed in March 2012. If the Coalition prevails and the Battlefield is reinstated to the National Register as of March 30, 2009, each of those permit renewals must be reopened to include the requirement that impacts be minimized.

Accordingly, every mining operation within a site listed in the National Register *at the very least* must minimize its adverse impacts on historic resources. No such minimization requirement applies to mining operations on sites that are not listed. Thus, if the Battlefield is restored to the National Register, as this litigation seeks, the operators of the Adkins

56

Fork, Bumbo No. 2, and Camp Branch mines must minimize the adverse effects of their mining on the site's historic resources. However, if the Battlefield remains delisted, the mining companies may freely destroy those resources.

West Virginia's surface mining regulations also empower the agency with responsibility over a National Register site to object to new mining permits that may adversely affect the listed site. W. Va. Code R. § 38-2-3.17.c. Here, that agency is the State Historic Preservation Officer. This requirement therefore authorizes the State Historic Preservation Officer to block a permit that will cause "adverse impacts" to the historic Battlefield. By contrast, this legal authority is nonexistent for unlisted sites.

In sum, West Virginia's SMCRA regulations automatically require mines to minimize their adverse impacts to historic resources on the Battlefield site – but only if the site's listing in the National Register is reinstated. The regulations also empower officials whose mission is protecting historic resources to block insufficiently protective permits. If the Coalition prevails in this litigation, these protections triggered by the Battlefield's listing will substantially increase the probability that the historic resources will be spared from destruction. In that instance, the Coalition's injuries will be redressed. *See Utah*, 536 U.S. at 464.

57

**CONCLUSION**

For the reasons set forth above, the Coalition respectfully requests that this Court reverse the judgment of the District Court, and remand the matter for additional proceedings.

Respectfully submitted,


  /s/ *Peter Morgan*
Peter M. Morgan
Sierra Club Environmental Law Program
1650 38th St, Ste 102W
Boulder, CO 80301
(303) 449-5595 x102
(303) 449-6520 (fax)
peter.morgan@sierraclub.org

Daniel P. Selmi
Attorney at Law
919 Albany St.,
Los Angeles, CA 90015
(213) 736-1098
(949) 675-9861 (fax)
dselmi@aol.com

Aaron S. Isherwood
Sierra Club Environmental Law Program
85 Second Street, 2d Floor
San Francisco, CA 94105
(415) 977-5680
(415) 977-5793 (fax)
aaron.isherwood@sierraclub.org

///
///
///
///

58

Elizabeth S. Merritt
Deputy General Counsel
National Trust for Historic Preservation
1785 Massachusetts Avenue NW
Washington, D.C. 20036
(202) 588-6026
(202) 588-6272 (fax)
emerritt@savingplaces.org

Andrea C. Ferster
Attorney at Law
2121 Ward Court, N.W. 5th Fl.
Washington, D.C. 20037
(202) 974-5142
(202) 223-9257 (fax)
aferster@railstotrails.org

*Counsel for Appellants.*

April 10, 2013

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. Excepting the portions of the brief described in Fed. R. App. P. 32(a)(7)(B)(iii), the brief contains 12,656 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point.

 _/s/ *Peter Morgan*_____
Peter M. Morgan
Sierra Club Environmental Law Program
1650 38th St, Ste 102W
Boulder, CO 80301
(303) 449-5595 x102
(303) 449-6520 (fax)
peter.morgan@sierraclub.org

April 10, 2013

**STATUTORY AND REGULATORY ADDENDUM**

# TABLE OF CONTENTS

**STATUTES**

    A. Federal Surface Mining Control and Reclamation Act ……………A3

        1. 30 U.S.C. § 1201. Congressional Findings………………......A3

        2. 30 U.S.C. § 1202. Statement of Purpose…………………....A3

        3. 30 U.S.C. § 1253. State Programs ………………………….A3

        4. 30 U.S.C. § 1256. Permits ……………………………….A5

        5. 30 U.S.C. § 1272. Designating areas unsuitable
           for surface coal mining ……………………………………..A6

    B. West Virginia Surface Coal Mining Reclamation Act ……………A6

        1. W. Va. Code § 22-3-8. Prohibition of surface
           mining without a permit; permit requirements;
           successor in interest; duration of permits;
           proof of insurance; termination of permits;
           permit fees ……………………………………………….A6

**REGULATIONS**

    A. West Virginia Surface Mining Reclamation Rules ………………A7

        1. W. Va. Code R. § 38-2-3. Permit Application
           Requirements and Contents. ………………………………..A7

    B. Federal SMCRA Regulations ……………………………………..A8

        1. 30 C.F.R. § 732.15. Criteria for approval or
           disapproval of State programs. ……………………………..A8

        2. 30 C.F.R. § 761.11. Areas where surface
           coal mining operations are prohibited or limited. …………..A8

        3. 30 C.F.R. § 761.17. Regulatory authority
           obligations at time of permit application review. …………..A9

A1

C. National Historic Preservation Act Regulations ………………….A10

    1. 36 C.F.R § 60.2. Effects of listing
       under Federal law. ………………………………………...A10

## STATUTES

### A. Federal Surface Mining Control and Reclamation Act

### 1.  30 U.S.C. § 1201. Congressional Findings

The Congress finds and declares that--

\*\*\*

(c) many surface mining operations result in disturbances of surface areas that burden and adversely affect commerce and the public welfare by destroying or diminishing the utility of land for commercial, industrial, residential, recreational, agricultural, and forestry purposes, by causing erosion and landslides, by contributing to floods, by polluting the water, by destroying fish and wildlife habitats, by impairing natural beauty, by damaging the property of citizens, by creating hazards dangerous to life and property by degrading the quality of life in local communities, and by counteracting governmental programs and efforts to conserve soil, water, and other natural resources;

\*\*\*

(f) because of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States;

\*\*\*

### 2.  30 U.S.C. § 1202. Statement of Purpose

It is the purpose of this chapter to—

\*\*\*

 (g) assist the States in developing and implementing a program to achieve the purposes of this chapter;

A3

\*\*\*

### 3.  30 U.S.C. § 1253. State Programs

(a) Regulation of surface coal mining and reclamation operations; submittal to Secretary; time limit; demonstration of effectiveness

Each State in which there are or may be conducted surface coal mining operations on non-Federal lands, and which wishes to assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations, except as provided in sections 1271 and 1273 of this title and subchapter IV of this chapter, shall submit to the Secretary, by the end of the eighteenth-month period beginning on August 3, 1977, a State program which demonstrates that such State has the capability of carrying out the provisions of this chapter and meeting its purposes through—

(1) a State law which provides for the regulation of surface coal mining and reclamation operations in accordance with the requirements of this chapter;

(2) a State law which provides sanctions for violations of State laws, regulations, or conditions of permits concerning surface coal mining and reclamation operations, which sanctions shall meet the minimum requirements of this chapter, including civil and criminal actions, forfeiture of bonds, suspensions, revocations, and withholding of permits, and the issuance of cease-and-desist orders by the State regulatory authority or its inspectors;

(3) a State regulatory authority with sufficient administrative and technical personnel, and sufficient funding to enable the State to regulate surface coal mining and reclamation operations in accordance with the requirements of this chapter;

(4) a State law which provides for the effective implementations, maintenance, and enforcement of a permit system, meeting the requirements of this subchapter for the regulations of surface coal mining and reclamation operations for coal on lands within the State;

(5) establishment of a process for the designation of areas as unsuitable for surface coal mining in accordance with section 1272 of this title provided

A4

that the designation of Federal lands unsuitable for mining shall be performed exclusively by the Secretary after consultation with the State; and

**(6)** establishment for the purposes of avoiding duplication, of a process for coordinating the review and issuance of permits for surface coal mining and reclamation operations with any other Federal or State permit process applicable to the proposed operations; and

**(7)** rules and regulations consistent with regulations issued by the Secretary pursuant to this chapter.

(b) Approval of program

The Secretary shall not approve any State program submitted under this section until he has—

**(1)** solicited and publicly disclosed the views of the Administrator of the Environmental Protection Agency, the Secretary of Agriculture, and the heads of other Federal agencies concerned with or having special expertise pertinent to the proposed State program;

\*\*\*

### 4. 30 U.S.C. § 1256. Permits

\*\*\*

(c) Termination

A permit shall terminate if the permittee has not commenced the surface coal mining operations covered by such permit within three years of the issuance of the permit: *Provided*, That the regulatory authority may grant reasonable extensions of time upon a showing that such extensions are necessary by reason of litigation precluding such commencement or threatening substantial economic loss to the permittee, or by reason of conditions beyond the control and without the fault or negligence of the permittee: *Provided further*, That in the case of a coal lease issued under the Federal Mineral Leasing Act, as amended [30 U.S.C.A. § 181 et seq.], extensions of time may not extend beyond the period allowed for diligent development in accordance with section 7 of that Act [30 U.S.C.A. § 207]: *Provided further*, That with respect to coal to be mined for use in a

A5

synthetic fuel facility or specific major electric generating facility, the permittee shall be deemed to have commenced surface mining operations at such time as the construction of the synthetic fuel or generating facility is initiated.

\*\*\*

      **5.  30 U.S.C. § 1272.** Designating areas unsuitable for surface coal mining

\*\*\*

(e) Prohibition on certain Federal public and private surface coal mining operations

After August 3, 1977, and subject to valid existing rights no surface coal mining operations except those which exist on August 3, 1977, shall be permitted—

\*\*\*

 **(3)** which will adversely affect any publicly owned park or places included in the National Register of Historic Sites unless approved jointly by the regulatory authority and the Federal, State, or local agency with jurisdiction over the park or the historic site;

\*\*\*

### B.  West Virginia Surface Coal Mining Reclamation Act

    **1.  W. Va. Code § 22-3-8. Prohibition of surface mining without a permit; permit requirements; successor in interest; duration of permits; proof of insurance; termination of permits; permit fees**

(a) No person may engage in surface mining operations unless he or she has first obtained a permit from the secretary in accordance with the following:

\*\*\*

A6

 (3) A permit terminates if the permittee has not commenced the surface mining operations covered by the permit within three years of the date the permit was issued: *Provided,* That the secretary may grant reasonable extensions of time upon a timely showing that the extensions are necessary by reason of litigation precluding commencement, or threatening substantial economic loss to the permittee, or by reason of conditions beyond the control and without the fault or negligence of the permittee: *Provided, however,*That with respect to coal to be mined for use in a synthetic fuel facility or specific major electric-generating facility, the permittee shall be considered to have commenced surface mining operations at the time the construction of the synthetic fuel or generating facility is initiated.

\*\*\*

# REGULATIONS

## A. West Virginia Surface Mining Reclamation Rule

### 1.  W. Va. Code R. § 38-2-3. Permit Application Requirements and Contents.

\*\*\*

## 3.17. Parks and Historic Lands.

\*\*\*

3.17.c. Adverse impacts to any publicly owned park and any place listed on the National Register of Historic Places shall be prohibited unless the permit applicant has valid existing rights or unless joint agency approval is obtained in accordance with subsection 3.19 of this section. In either case all adverse impacts must be minimized.

\*\*\*

## 3.17.d. Effect on Historic Places and Archaeological Sites. Where the
proposed surface coal mining operation will adversely affect any publicly owned park, any place listed on the national Register of Historic Places or archaeological sites, the Secretary shall transmit to the Federal, State or local

A7

agencies with jurisdiction over the park or historic place the applicable parts of the permit application, together with a request for the agency's approval or disapproval of the operation. Consideration and coordination of the permit review shall be in accordance with the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.) and the Archaeological Resource Protection Act of 1979 (16 U.S.C. 470 et seq.). The agency shall have thirty (30) days from receipt of the request within which to respond unless an additional thirty (30) day extension is requested and granted by the Secretary. A permit for such operation shall have joint approval of all affected agencies. Failure of the agency to respond to the Secretary's request within the prescribed time period shall constitute approval.

\* \* \*

## B.  Federal SMCRA Regulations

### 1.  30 C.F.R. § 732.15. Criteria for approval or disapproval of State programs.

The Secretary shall not approve a State program unless, on the basis of information contained in the program submission, comments, testimony and written presentations at the public hearings, and other relevant information, the Secretary finds that—

> (d) The program provides for the State to carry out the provisions and meet the purposes of the Act and this Chapter within the State and that the State's laws and regulations are in accordance with the provisions of the Act and consistent with the requirements of the Chapter.

\* \* \*

### 2.  30 C.F.R. § 761.11. Areas where surface coal mining operations are prohibited or limited.

You may not conduct surface coal mining operations on the following lands unless you either have valid existing rights, as determined under § 761.16, or qualify for the exception for existing operations under § 761.12:

\* \* \*

A8

(c) Any lands where the operation would adversely affect any publicly owned park or any place in the National Register of Historic Places. This prohibition does not apply if, as provided in § 761.17(d), the regulatory authority and the Federal, State, or local agency with jurisdiction over the park or place jointly approve the operation.

\*\*\*

### 3. 30 C.F.R. § 761.17. Regulatory authority obligations at time of permit application review.

\*\*\*

(d) Procedures for joint approval of surface coal mining operations that will adversely affect publicly owned parks or historic places.

    (1) If the regulatory authority determines that the proposed surface coal mining operation will adversely affect any publicly owned park or any place included in the National Register of Historic Places, the regulatory authority must request that the Federal, State, or local agency with jurisdiction over the park or place either approve or object to the proposed operation. The request must:

        (i) Include a copy of applicable parts of the permit application.

        (ii) Provide the agency with 30 days after receipt to respond, with a notice that another 30 days is available upon request.

        (iii) State that failure to interpose an objection within the time specified under paragraph (d)(1)(ii) of this section will constitute approval of the proposed operation.

    (2) The regulatory authority may not issue a permit for a proposed operation subject to paragraph (d)(1) of this section unless all affected agencies jointly approve.

    (3) Paragraphs (d)(1) and (d)(2) of this section do not apply to:

A9

(i) Lands for which a person has valid existing rights, as determined under § 761.16.

(ii) Lands within the scope of the exception for existing operations in § 761.12.

## C. National Historic Preservation Act Regulations

### 1. 36 C.F.R § 60.2. Effects of listing under Federal law.

The National Register is an authoritative guide to be used by Federal, State, and local governments, private groups and citizens to identify the Nation's cultural resources and to indicate what properties should be considered for protection from destruction or impairment. Listing of private property on the National Register does not prohibit under Federal law or regulation any actions which may otherwise be taken by the property owner with respect to the property.

\*\*\*

 (d) If a property contains surface coal resources and is listed in the National Register, certain provisions of the Surface Mining and Control Act of 1977 require consideration of a property's historic values in the determination on issuance of a surface coal mining permit.

A10

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2013, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

_/s/ *Peter Morgan*_____
Peter M. Morgan
Sierra Club Environmental Law Program
1650 38th St, Ste 102W
Boulder, CO 80301
(303) 449-5595 x102
(303) 449-6520 (fax)
peter.morgan@sierraclub.org